Good morning Chief Judge Owen and may it please the court. My name is Kenneth East and I represent Fort Worth Police Officer, now Corporal Detective Richard A. Hoeppner. I know you have something like 400 pages of briefing in front of you on this case and we appreciate the extra time you've allowed. Even so, my client is here as the appellant in the lead case and appellee in a different case. I have 17 minutes to cover a lot of ground. This is an undeniably tragic case obviously, but as this court has observed on numerous occasions, not every tragedy finds a remedy in the U.S. Constitution. Because courts in this case have already ruled that facts are as the only eyewitnesses say they are, there simply has been no constitutional violation. Accordingly, the plaintiffs have been forced to be creative in their prosecution of this case and have asserted theories and allegations not supported in any actual evidence. My client has been forced to endure eight years of litigation in which he has been called a conspirator, a fabricator of evidence, and other things that have not been borne out by the evidence, let alone reality. The plaintiffs lost their father in this case. It's a tragedy that we cannot fix. But at this core, this is a negligence case posing as a 1983 case, and it's time for the court to put this long litigation to an end. There are two main subjects before the court now that stem from a common set of background facts and procedural history. One is my client's entitlement to summary judgment and qualified immunity on the only claim left in this case, excessive force. The other is the plaintiff's recent efforts after eight years of litigation to insert an entirely new cause of action into this case that has never before been in this litigation. As to the first point, in a moment I will direct the court's attention to the district court's order denying summary judgment. As to the second point, plaintiffs, as the district court has stated in numerous orders in the past, that the plaintiffs are simply wrong about the existence of their new cause of action for trespass or invasion of privacy or invasion of curtilage or whatever it is they are saying it is, in order to have some relief based on that, they are attempting to show under the U.S. Supreme Court Mendez case that they have an entirely separate Fourth Amendment. But that claim has never been asserted. The district court has said it was never asserted. And even if it had been asserted, as the district court explained, buried in an interminable set of pleadings, hundreds of pages in length, in 2018, Judge Means, who was then the presiding judge of the district court, without question dismissed the claim. At its essence, they are challenging a 2018 dismissal order. This court has no jurisdiction to go back and tell the district court that it has misinterpreted its own orders. In recent orders, Judge Pittman, who has taken over this case and done a, even though I am challenging his order today, has done an incredible job understanding this complex history of this case. He has said that there is no such case, no such claim. If there were such a claim, it was dismissed in 2018. They filed an entirely separate appeal, the plaintiffs have, in the 10457 case of these consolidated appeals, in which they have challenged something. It is not clear what, but none of the orders they challenged are either timely or orders over which this court has any jurisdiction whatsoever. The only arguably timely one was the, after filing a motion for reconsideration, after filing an attempt at a certified appeal before this court, which this court denied, after filing a motion for a 54B final judgment, all trying to get that new claim before this court, the court denied all of it, especially the 54B, which they said, which the district court said, I cannot rule on a claim that is not before me. There is no basis for an entry of a 54B final judgment. Okay, so that was denied and that one was timely. If you are looking at the 10457 appeal, plaintiffs filed a timely notice of appeal as to that, but the cases I cite in my appellee's brief in that case say, show that there is no appellate jurisdiction over the denial of a 54B motion and even if there were, all they are asking the district court to do is enter a final judgment, it wouldn't give this court power to go back and review underneath the ruling. It would be to go back and enter the final judgment and if the appellant wants to appeal from that final judgment then they could, but that is an issue that I would like to spend no more time on unless the court has questions about it. Moving on to the main reason that we are here today, Your Honor, if I could direct the court's attention to the district court's summary judgment order found in the record 9417. The district court spends some time addressing the procedural history, addressing the allegations and addressing what standard summary judgment law and qualified immunity law is. He then has a very short analysis of the actual claims in this case and beginning on page 7 of his order, he says, I know this is a different panel than was here before and I know that there is a lot that has happened here. This case was filed, the complaint was amended, all types of allegations against all types of people were dismissed through a number of dispositive motions. My client filed a 12C motion that the district court granted it in part, denied it in part as to the excessive force claim because the plaintiffs had promised in their pleadings that the autopsy report would show that things could not have happened as the only eyewitnesses say they happened. In a footnote, Judge Means said that's what he's mostly relying on is this promise of what the autopsy will show. On appeal, this court said the allegations are enough but they're only allegations and they use a long string of words, claims and they show what this all means. We go back, we do a lot of litigation, a lot of discovery, have a lot of ancillary disputes and end up filing motions for summary judgment. In response, the plaintiffs put on experts to say what this forensic evidence supposedly means. Every one of their experts says there is no conclusion that they can draw. They were asked, their expert, police procedures expert, were not asked to examine evidence and determine what happened. They were told to consider what happened. They were told a plaintiff's theory, not based on any direct evidence, to find a way to make random pieces of evidence match this theory. Dr. Ruzecki said unequivocally that the autopsy cannot show what happened. The autopsy cannot say the order of shots. The autopsy cannot say where the body was positioned. Today, the plaintiffs have brought in exhibits and they will be useful because as we examine the district court's order, the first paragraph says, Waller could not have had the gun in his right hand because his right palm had blood droplets. Okay, well there exhibit number seven shows his right hand. Dr. or Mr. Heskey, the plaintiff's own forensic science specialist, says in his deposition over a series of pages beginning at record 5910, and I'm referring to the lead case record at all times, do you know where the blood came from on the right palm? No, I don't even know if that is blood because nobody tested it, he says. Well, could it have come from the hand being underneath the body or somewhere else? Yeah, it could have, but I don't know. If it's spatter, as you propose, why is there a demarcation between the palm and the fingers? I don't know. The large stains in the palm of the hand, I've already said a couple of times, that looks like maybe transfer or possibly passive blood drops. I don't know. Yet the district court says the blood on the right palm is the reason he's denying summary judgment because he couldn't have had a gun in his hand at the time he got blood on his palm. But plaintiff's own expert says that the blood could have come from anywhere. He doesn't know where it came from. It could have come from underneath his body. It could have been a transfer or a drop. He doesn't know. It's inconclusive. As to the... Did your client move the body? Nobody moved the body, Your Honor, among many outrageous allegations, including that the gun was moved. The original theory was the plaintiff's moved the gun away from the body. In TV, you plant the gun on the dead person. No, no, here they moved the gun away from the body is the allegation. Later it didn't bear out. It makes no sense. The quote unquote moving the body is the first responding officer to arrive was an EMT police officer who immediately went to check Mr. Waller to see if he was alive. As he was approaching the body, my client, Officer Heppner, said there's a gun underneath him because as he took the gun off the trunk of the car, spun and aimed it at my client. All the plaintiff's experts, by the way, agree that the DNA and fingerprint evidence on the swipe mark that's pictured in my brief on the trunk of the car are Mr. Waller's DNA and fingerprints. Spun, aimed the gun at my client. My client was stunned. When the EMT arrived, he pulled him up, rolled him over, removed the gun, put it behind him, checked vitals. When he pulled him up, you can see a big swipe mark on Mr. Waller's left side where his left arm was underneath him. He pulled him up and it swipes up and all the experts agree that's a swipe mark from the left arm. Now his hands are out. So that was the allegation about moving the body. Read Mr. Taylor, the plaintiff's police expert report. There's nothing improper about that. Read Dr. Gruszecki, the medical examiner. There's nothing improper about that. You want to determine whether or not there's a gun when the person may or may not still be alive. He removes the gun, checks them for vitals. That is the moving the body allegation. The second paragraph, the district court discusses the gun in the left hand because of the pattern of the wounds. And the plaintiffs have produced exhibit number three. And this gets to some of the most incredible part of this. First of all, we're not saying he had a gun in his left hand. We don't know and all the experts, plaintiffs experts, agree that you can't recreate something that's a multi-shot shooting like this. We think he grabbed it with his right hand and maybe had both hands pointed forward when he turned toward my client. But there is an exhibit to the plaintiff's first amended complaint which is at record 508. It's their original diagram, animated diagram they produced in this case. And their theory, I've got to demonstrate this, is that because there's a hole in the thumb here and a hole in the finger here, one shot went through and caused that. The plaintiff's pathology expert says, yes, she was asked to determine if the hand were up here, could that account for that shot? I said, were you asked to consider any other positions? No. Did you consider other positions? No. So all you were asked to do was draw a straight line. And she said, yes, that's it. And so if the hand were up here and in order to get it here, she, Mr. Heskey, all agree that it would have to be in what she repeatedly describes as a palms-up position. In order to have a bullet coming from the front piercing on that trajectory, the hand has to be turned in a way that's almost difficult, or it is difficult to get into. Mr. Heskey says that type of evidence should be discounted if you have other evidence because it's such an unnatural position. Okay, so let's assume that it's true, it's theoretically possible. The claim is he was shielding his eyes. Nobody shields their eyes like this, but that aside, I asked Dr. Heskey. But in order for that to happen, the first shot would have to be up here because in order to make their theory work, this is the first shot. And the rest of the shots are all center mass. So an officer shoots high and then shoots low for a volley of shots. Yeah, well, are there any other explanations? If he shoots the first shot center mass and has Mr. Waller's bending forward, the hand gets into a position as he's going down where that shot would be created. Oh yeah, that's perfectly consistent with the officer's eyewitness accounts. So, second paragraph is irrelevant because we're not claiming it was in the left hand. Finally, he says, the district court says, injuries are consistent with him holding his hands above his eyes when he was shot because Hepner was shining a flashlight into his face. Well, plaintiff's expert, Mr. Taylor at 5969 of the record, agrees that Officer Hepner, there's no evidence that he was shining his light at Mr. Waller at the time Mr. Waller rearmed himself. Initially, when he came out holding a handgun, my client was shining his light at him and pointing his gun at him saying, drop the gun, drop the gun. It took a long time. Mr. Waller finally set the gun down on the trunk of the car. But when my client went to position himself between Mr. Waller and the gun, Mr. Waller, for reasons unknown, suddenly grabbed the gun, spun, aimed it at my client. Mr. Waller may have not been convinced they were police officers despite Officer Hanlon coming and identifying themselves as police officers. There were issues that just require speculation as to why he did it, but that's what he did. And so in order to get to this third paragraph, the district court is theorizing with the plaintiffs that if this indeed was the first shot, there's blood on the left side of the face and blood on the right hand. Well, plaintiff's experts say the blood on this face are big droplets of blood consistent with the blood on the left hand. And eight, whereas the blood on the fingers of the right hand are much smaller droplets and they're only on the fingers for whatever reason, why would there be a completely different look to the blood here as opposed to the blood here if it all came from the same shot at the same time? And then Mr. Hiskey says, well, maybe this wasn't where that hand was at that time. It could have been somewhere else. But of course that blows their entire theory. Finally, the district court turns to a part of the opinion that he calls the officer's lack of credibility is the title, but what he's saying is that in order to find summary judgment, he has to believe the officer's account. Well, the cases are clear that that is exactly what you do. If there is an unfortunate shooting, and this court has had several examples of them, where the only eyewitnesses left are the surviving police officers, then you believe what the police officers say unless there is real evidence to overcome it, not just speculation. And the cases include Orvie Copeland on Averroes and a 2013 case that's not in my brief, Watson v. Bryant. And I see my time is up. I wouldn't get to everything. Thank you, Your Honors. May it please the court, I'm Mike Ware. I'm from Fort Worth, Texas. I represent the plaintiffs below appellees in this court. The district court was absolutely correct to deny Officer Heppner's motion for summary judgment. There are genuine issues of material fact in this case, and it should proceed to trial and let a jury decide those issues of genuine fact. But, because this is an interlocutory appeal of the district court's overruling or denial of Officer Heppner's motion for summary judgment, and it's a decision taken up under the collateral order rule, this court's scope of review is exceptionally narrow and exceptionally specific. This court's review of Judge Pittman's decision, the district judge who denied the motion for summary judgment, is very limited, and it was limited initially by the Supreme Court in the Jones case cited in our brief, and then reiterated by this court in the Kinney decision cited in our brief, reiterated by the United States Supreme Court in the Toland case, and then most recently reiterated by this court in 2019 in the Cole case cited in our brief. And the issue is, did Judge Pittman make a mistake of law in deciding that it is a material fact whether or not 72-year-old Mr. Waller was armed and had a gun in his hand during the one second, two seconds that Officer Heppner fired six shots into him. And if he was not armed, did not have a gun in his hand, then this is a violation of the Fourth Amendment right to be free from unreasonable seizures as a matter of law. I don't think that even Officer Heppner is contesting that. Counsel, are you arguing that qualified immunity in this case turns on the fact of whether or not the decedent had a gun in his hand or not? To a large extent, yes, Your Honor. Isn't it the perception, the reasonable perception of the defendant officer, whether the person has a gun in fact or is later found to be unarmed, wouldn't it be important for us to consider what the officer's reasonable perception of the circumstances were? Generally yes, Your Honor. I would agree with that. But in this case, it's one or the other. It's one or the other. And so that's really the most important part of this case. The main material fact in this case, as determined by the district judge. At this juncture, is that purely a credibility call? Well, that gets into the genuine issues of fact. And the credibility call is, I mean the judge below has already made those decisions, has already determined that there are genuine issues of fact. Now, the only thing... But I guess my question is, is there anything in the record that would tend to confirm whether the decedent had a weapon on him or not, or where the weapon was, what the perception of the officer is, or do we just have conflicting versions of what happened? One version that the man put the firearm on the trunk of the car, the other one that he picked it up again. So are we left with just those conflicting versions of events, or is there something, I know there was some mention of some blood splatter evidence, is there something that would confirm one version or the other that we can find with enough certitude in order to discuss qualified immunity? I think that what all our experts agree and testify to, is that there's a lot of evidence that's been testified to, and what even the city's representative, Chief Krause, testified to is, based on the physical evidence, it seems impossible that he could have had the gun in his hand at the time he was shot and killed. That's the physical evidence, that's even Chief Krause, the city's representative says, it appears impossible that he could have had the gun in his hand at the time he was shot and killed by Officer Heppner. I would say that the officers, Officer Heppner and the other witness, Officer Hanlon, their stories differ. They did not come up with this story about the gun in his hand. They came up with, I think, an inherently outlandish story that a 72-year-old, Jerry Waller, no criminal history, married forever, six grandkids, four kids, long-time small business owner, military veteran, this outlandish story that he came out with a gun, actually put the gun down, and then inexplicably, after these officers say they identified themselves as police officers, makes a lunge and a play for the gun and turns it around on them as if he's going to use it on them at that time. That's just inherently outlandish, and in and of itself raises an issue of genuine fact. And as I said, it's not a story they told the first time. It's a story they only told after consulting with their association attorney and after learning they had gone to the completely wrong address. What's the best Supreme Court case or Fifth Circuit case that we can look at that is so factually similar to this case wherein a 1983 violation occurred? Is there one in particular that you'd cite us to? Well, I think as far as factually similar to this case, I mean, I think at this point, what this Court has jurisdiction and authority to decide is the law. I don't think the facts are at issue at this point. Well, but in doing that, though, particularly on qualified immunity, we look for cases where there's some precedent that we can compare factually where there's a knowledge by the defendant that this is something that is a violation of a constitutional right. Well, I think in this case it's undisputed. Everybody agrees that to shoot and kill an unarmed individual is a violation of a constitutional right. Well, it is, but the Supreme Court, for better or worse, the Supreme Court has told us not to generalize the rules such as the one you just said, which I agree is a common sense. Who wouldn't know that? But the Supreme Court has told us not to so generalize. So that's why I'm asking about a case that we can look at, but I understand your point. I think that's an issue that even Officer Heppner doesn't contest. Okay. Well, I guess we'll see. Thank you. Please, the Court. I'm Art Bringer from Fort Worth and representing the plaintiffs. Let me just, I'm going to respond briefly because I think the facts are mixed up in the way it's been presented. First of all, these two rookie probation officers go to a call for, actually a welfare call, because the call that went out was from a... We've got that. All right. But when they, they're at the wrong house, okay? They're at the wrong house. And what do they say occurred doesn't fit with the physical evidence, okay? First of all, what happens is Heppner goes to the back, stays in the back. They shine the light around, etc. They come to the front, and then he sees the light come on inside. He radios for Heppner to come to the front, and when he does, he stands there for a while. There's a time lag. He's shining his light on himself and knocking on the door, and then he hears a yell from his, they're good friends. He can't understand what's being said. He runs around the back, and then they have the story about the gun being put on and this, that sort of thing. But that's not the first story they told. When they called in the dispatcher, they said that Heppner says, I mean Hanlon calls in. Hopner's right there with him, and he says that Hopner came in, that the man came into his garage. He had a gun. He wouldn't put the gun down, and he shot it when he aimed it at it. A little bit later, Detective Green interviews him for the search warrant affidavit, and they said the same thing, except this time they said the man came around the corner, and it's not clear whether both of them saw him or just Heppner, and he pulls, and he, once again, he has a gun. He tells him to put it down. He wouldn't put it down, and he shoots him. All right, only after the union lawyer comes out there and tells them they're at the wrong house do they then, and then they're interviewed by Detective Green, and in those interviews are tape recorded, and in the interview they said quite clearly that Mr. Waller put the gun down on the, on the car, and then he starts back, and then he comes back and picks it up, aims it at Hopner, and Hopner opens fire. Now, both experts, for us and for them, agree those shots, those five shots took place in less than a second, less than a second. Our guy says a second. They say less than a second, okay? Then he shoots him a second time. He says, when he says he grabs the gun, he has it in both hands. They're saying we're not saying he didn't have it in his left hand. That's what he clearly says, and he never changes his mind on his deposition. He says the same thing. He had it in both hands, all right? And then he said he still had it in his hand as he was going down, and he shoots him another time, about a second later, okay? Now, the first wound track, it's not like counsel says. It goes through the thumb, on the side of the thumb, breaks the thumb in half, breaks the bone in the first finger, and then it breaks the bone in the second finger, okay? One of the photos we have here shows the X-ray that shows how the splinters, it's fragmented. Two of them are found behind him, and there's two of them that are up in the finger themselves. They're shown on the X-ray, okay? That's his story. He doesn't change it, and he says he's shooting from a distance of seven yards, okay? Hanlon, the other guy, says that he has a completely different story. He says they were separated after Green talked to him, and he says that they went for the gun right there. They were at one another. He pulls it back, and he says that Houtner shoots Mr. Waller at a distance of one to two feet. Now, there's no gunpowder residue on the body, and the experts all say that there would be gunpowder residue on the body at that distance. But the other thing is he's going down because after there's a shot here, and the second shot goes pretty much straight through and hits the aorta. That's a death shot. As he's going down, the next two are at steep angles. The last one goes through the cravicle, comes out below the breast, goes into the abdomen, into the groin area. He's almost prone, according to Dr. Grisecki, when that takes place. So if it was at one to two feet, he'd have to be on his knees to file that last shot. And we say, and I think in the evidence, once again, as counsel said, under Kenney v. Weaver, this court is just not deciding the factual determination that the judge made that there were facts such as to go to a jury, but just whether or not there's a legal impediment to the summary judgment. But at one point the court says, you know, that they identified themselves, okay, because Heppner says he never identified himself. And he admits that, but he says when Hopner came around, when Hanlon came around, Hanlon said Fort Worth PD. However, Hanlon was never there. And the reason I say Hanlon was never there was, in the light most favorable to the plaintiff, Mrs. Waller was in the house about 20, 25 feet away from where this garage is, and she hears the same yelling that is heard by Hopner, I mean by Hanlon in the front, okay. She hears a man's voice say some words, and as the words were being spoken, she hears the bam, bam, bam, the gunshot wounds. Now, she's interviewed about an hour and a half after her husband's death. She came out on the scene, saw him there. They whisked her away. They took her to the hospital eventually. So at the hospital, Detective Baggett, who'd interviewed these two, goes to the interviews her, and that's when she gives the statement about, you know, there were just a few words spoken, and then she hears the shots. Hanlon is over on the – this is a long kind of a ranch-style home. She's over there. He runs around the side, and he says in his taped interview it takes him nine seconds to get over there. Hopner says it takes him 45 seconds. Now, Hopner's talking about when he radioed him. There's probably a little bit of a time lag in there. But in any event, it wasn't in time to witness the event. And like I said, his rendition of it is totally different. They do a walkthrough, and he goes through the walkthrough, and he's way over here. He's not there where he says he can't fire because Hopner's in his line of sight, all that stuff. None of this makes any sense. And by the way, he was terminated 90 days after this for filing a false probable cause affidavit. So the credibility issue doesn't fit. And they have never said that there was anything, any other way in which this took place. Hopner's – Hanlon, by the way, also says that Mr. Walter grabbed a gun with his left hand. He had it in his left hand. Hopner says he had it in both hands. Neither one of them have ever changed that. And this is the first I've ever heard, and we're not saying that he didn't have the gun in his left hand. The reason I say that he didn't have the gun in his left hand because, as we've shown you, the shots that went through, just like Judge Pittman said, the shots went through. It wasn't any kind of an odd work. He had his hands just like this to see if there was anything like any trying to – because Hopner the whole time had his flashlight on him, as they do, and he's standing in the shadows. That's Exhibit 1 that we have that shows how dark it was out there. And so he's holding the flashlight, and he said in his deposition he had the flashlight on him when he opened fire. And, by the way, we have – it happened in 2019, but there's a similar situation, same modus operandi. They go out there because they don't notify the people when they go to do one of these investigations. So they went there to Ananita Jefferson's home. A neighbor had called to go check on her, another welfare check. They're walking around, and they don't see anything. She thinks it's just like Mr. Waller did, thinks that there's some kind of prowler, gets her gun, and she's in the house with a gun, and this is all on videotape. You hear him say, put the gun down, bam, the shot happens right there, she's killed. That's what Mrs. Waller says happened here. The shots were immediately after. She heard a few words spoken followed by those shots. He didn't get around there in time to see any of that, which is why his story is so at odds with his partner's story. So, and as I mentioned, it's not like – this is the X-ray I showed. And the other thing is the blood spider is very, very important because Mr. Waller has blood spider on the left-hand side of his face, and both of our experts and Judge Means mentions that he has – that Mr. Hiskey has excellent credentials as a blood spider expert. He's been head of the crime lab, or he was assistant head of the crime lab at Fort Worth for nine years, head of crime lab for Arizona for 13 years, and Oklahoma about similar, and he's been a professor up at North Texas for a long time in criminalistics. And the blood spider's on the left-hand side, right by the ear, which is where it would be from this – when this – when the projectile hits the left thumb and projects onto the side. And then he also gets the same type of blood spider on the fingers and part of the thumb – I mean part of the – of the palm. And this is where the – two of the fragments end up right behind him about – this is the car right there. And there's no real evidence that the gun was actually on the car, but you can see that Mr. Waller was on Coumadin and he had a lot of – a tremendous amount of blood. Here's the pistol over here. And when counsel was talking about the other officer that came along to lift him up and all that, that's not what happened if you look at the – once again, the evidence and the most favorable to the plaintiffs. When that officer, Hardin – you've got all these H's – when Hardin shows up, he's with another officer who – a female officer. And when they get there, they say that as soon as they got there, Mrs. Waller came out. Well, prior to that, the EMTs arrived. Mr. Gonzalez is the EMT. He's there with an assistant. And as they come there to look at the body, there's an officer back there. They don't know the name, but this is all in their report and in their testimony deposition. They go there. They look at the situation. They want to see if Mr. Waller – they want to take a pulse. They said it's a crime scene. Don't touch him. They don't move the body. But they say, watch out, there's a gun over there. So they're warned about the gun before these two ever even show up. And while they're there, Mrs. Waller comes out. That's noted in their report too. And then they proceed to go back, and then they examine Mrs. Waller. They end up taking her to the game, et cetera. So – and the other thing is this officer who says he fell on his – on a hand, the gun was under him, that sort of thing. Well, there's all sorts of – you can see how – everybody can see there's a pool of blood under there. Here's his right arm. There's no blood on it. And the only blood is these spatters right here. So he even admits in his deposition, well, maybe his arm wasn't underneath him because they were trying to put the gun in his hand, so they had the arm up under it like that. That just didn't happen. I mean, the physical evidence, once again, is complete. And so – and basically, as far as that goes, these – the experts, Amy Grisecki is a medical examiner, was with the Dallas Medical Examiner's Office for nine or ten years. She's a medical examiner for a number – in private practice, but for a number of small counties now that can't have their own medical examiner. Ed Hiskey is, as I said, has been a longtime reconstructionist and so forth, and they both put this evidence together and say, no, that's not what happened. And Chief Krause, who was the chief of police at the time, says no. He looked at the evidence, too, and he said, I don't see any way he could have had that gun in his left hand. And once again, he couldn't have it in his left hand. He couldn't have had it in both hands. And the reason being the same one that Judge Pittman cites when he's affirming the – is that there's evidence that the gun was not in either hand and consequently was unarmed when he was shot by him. So that's the case, and counsel wants to argue about the facts, but the facts were determined by Judge Pittman and under Kinney v. Weaver. This court doesn't have the authority to review it like they would under Rule 56. And so that's the situation. Let me go quickly to – What's your explanation as to where the gun actually was? You're saying there's no evidence it was actually on the trunk of the car, but then it was on the ground. But then you said they were trying to place it in his hands. Where are you contending the gun was when he was shot? What are we contending? Your Honor, I'm sorry. Where was the gun when your client was shot? It's pretty apparent that he probably disposed of the gun. He'd either tossed it. It's got scratches on it. It could have been tossed. It could have been put on the car. But in any event, it happened rather quickly. I think it's pretty clear that he came out there. There's other discrepancies. Mrs. Waller says that the garage door was closed and locked. She did that every time. They said it was open. It takes about 10 seconds for it to go all the way through. So if he came out in there and it starts coming up and he sees him, he's out in the shadows. He's out here. And he's drawn down on him, got his flashlight on him, put the gun down, put the gun down. Here's a guy. He's 72 years old. I mean, he's no shirt on, white socks, I mean, jeans, and he's standing there. But he's been in the Army. He knows he doesn't have any kind of target. I mean, he's got a gun, but this guy's got the light shining in his eyes. That doesn't answer my question. Where was the gun at the moment, within a second or two? It wasn't in his hands. That's what the evidence shows. I don't know where it was. I mean, it was on the ground, obviously, or on the car, one of the two places. But it wasn't on the car. Why would it be on the ground before he was shot? Well, where it's shown in the crime scene photos, if you look at Exhibit 2, okay? He says he puts it over here. The other thing is this gun was supposed to be in this pool of blood. We've said that that's okay. Detective Green ordered that there be a ballistics test on the gun, even though the gun hadn't been fired. All the shells were there. And that requires wiping it clean of all evidence. It's been wiped clean and never examined for DNA, fingerprints, or even blood. All right? So, basically, that's where the gun ends up. Whether it was, you know, how and where it got there, you know, we don't know. Because, you know, there's no other witness, okay? But it's not disputed that he carried the gun out into the garage when he thought something was going on out there. The question is, did he put it on the car? Did he continue to hold it? What happened to the gun after that? I mean, we don't know. Well, we know he didn't have it in his hand. That's what we know because of these wounds to his hand and where he was shot. So, I mean, if he was holding the gun like this when he was shot,  he's right-handed. He's right-handed. That's right. To say he wasn't holding it in his left hand doesn't tell us that he couldn't have had it in his right hand, does it? Yeah, I mean, yeah, he's right-handed. He has the gun in his right hand, according to Hopner, when he walks into the garage. And, once again, he's got blood splatter on the right hand. So, showing what happened to his left hand, how does that tell us what happened to his right hand? Well, because he has blood splatter on his right hand. If he had the gun in his hand, how would he get the blood splatter in his right hand? And just like Judge Pittman says, how would he get the blood splatter? It's not there. And this happens quick, once again. This happens like that, according to Miss Waller. There's nothing that indicates she was not aware of the fact that she had been told by the EMTs her husband was dead. She was not aware of how that happened. She was told by the officers that had her that they were looking for the man that did this. And, once again, that's the way it happened. And are there fact issues? Sure, but there's plenty of evidence that that didn't happen that way. All right. Now then. You're out of time. May it please the Court. My name is Lynn Winter, and I represent the city of Fort Worth, Texas. Preliminarily, just as Mr. East outlined earlier, the city also disputes that this court has jurisdiction as to any separate Fourth Amendment claim of which appellants now attempt to raise. So the city instead is going to focus on whether the trial court erred in finding that there was no city custom policy or practice that had the requisite culpability and causation as to the claim for excessive force, whether the trial court erred in finding there was no evidence of deliberate indifference, and, lastly, whether or not Monell is unconstitutional. We all agree that this is an undeniably tragic case, but under the law, to hold the city liable under Section 1983, an appellant has the burden to show that an official policy promulgated by the city's policymaker was the moving force or actual cause of the constitutional injury. Now, appellants spent much of their time attempting to resurrect this independent Fourth Amendment claim, but the trial court correctly determined that the only underlying claim that remained was the one for excessive force against Officer Heppner. Therefore, in accordance with Fifth Circuit precedence, it limited its analysis to the city's purposes for the purpose of municipal liability, only to those that related to Officer Heppner's alleged use of excessive force. The Fifth Circuit has continuously applied this principle numerous times, and in Foyer v. City of Arlington found that regardless of what transpired up until the shooting itself, it is the suspect's movements that gave the officer reason to believe at that moment whether there was a threat of physical harm that mattered. Consequently, the court must focus solely on those policies that would have affected Officer Heppner's judgment the moment he decided to use deadly force for the purpose of the Monell claim. Much to appellants' opposition, as a matter of law, the policies of which they complain, the failure to verify addresses, protocol on burglary calls, staffing shift with rookies, are simply too attenuated to the officer's use of force to invoke Monell liability as to the city. They do nothing more in this case than set the stage for the events that followed. Therefore, they cannot be the moving force behind Heppner's alleged use of excessive force. And the record shows that appellants failed to point to any written policy that resulted in the alleged deprivation of Mr. Waller's constitutional rights in the form of excessive force because there are none. In fact, on the date of this incident, the Fort Worth Police Department had numerous written directives in place to the opposite effect as we outlined in the record. The official policies of the city's police department prohibit the use of unjustified force and provide comprehensive guidance to officers on the use of deadly force in compliance with the Supreme Court standards in Tennessee v. Gardner and this court's holding in Cole v. Carson. None of the policies identified by appellants have that direct causal link between the municipal policy and the constitutional deprivation because they do not pertain to the decision to use force. Accordingly, appellants failed to provide evidence to the demanding standards required by Monell to hold the city liable. However, even if appellants could establish a fact issue on a policy that was the moving force and even if they had pled the Fourth Amendment search claim, there's simply no evidence that any policy was enacted with deliberate indifference. This court has consistently held that proof of deliberate indifference generally requires a showing of a pattern of violations and here the trial court correctly found that the showing of one incident that occurred five years after this one was insufficient to create that genuine issue of material fact as to whether the city's excessive force policy constituted deliberate indifference. In fact, the city produced numerous investigations to appellants yet they only pointed to one as proof of that pattern of violations and the Fifth Circuit has long held that deliberate indifference be shown by more than just a small number of cases. For example, in Peterson v. The City of Fort Worth, this court held 27 excessive force complaints in a period of three years was insufficient to establish that necessary pattern. Here, the court was faced with just one to examine and this court in Peterson reasoned that because our department conducted internal investigations into each complaint, we couldn't have acted with deliberate indifference as to any of those policies. The same thing happened in this case. After the shooting occurred, the police department undertook our critical police investigation, looked at all the facts, listened to all of the evidence there and found that there was no violation of policy and in fact we used that investigation to make changes to our own policy to ensure that something like this didn't occur again. So that in of itself forecloses appellants' argument. And lastly, appellants attempt to find briefly in their briefing that Monel is unconstitutional. However, the Fifth Circuit is a strict dare decisis court and cannot ignore a decision from the Supreme Court unless directed to do so by the court itself. As this court said in National Coalition for Men versus Selective Services. The court reiterated that it does not have the authority to renounce Monel as its binding precedent and the prerogative to overrule it lies solely with the United States Supreme Court. Unless this court has any questions, I will concede my time back. Thank you. Thank you. I'm going to rely on our brief since we've got off on other things. I didn't get a chance to initially address the issues involving the policy. However, I do want to mention jurisdiction under the question concerning the search is part of what's called the cross-appellate doctrine. In other words, we're not seeking any relief over and above what we were before and consequently we don't have to do it. We can take issue with anything that the judge did. And we properly pled with a line of brief that there was not only an illegal seizure but an illegal search specifically. Judge Means recognized that. They said he said it was dismissed. He didn't. He actually said he dismissed things that weren't discussed. He discussed this. We've got it in the brief. And so that is part of our pleading. The other, I won't go into the rest of it now, as far as the policies go, the defendants don't discuss at all a case that I think is primarily responsible for changing the law, and that is Judge Alito's opinion in County of Los Angeles versus Mendez. And that Mendez case says that the approximate cause is the causation requirement. It also says that you separate out both the separate torts, both the tort of seizure and torts of illegal search. And basically that also applies, we believe, to the requirement, for instance, of deliberate indifference. The court measures that by saying they have to have actual knowledge, and that's just not the proper term. It's new or should have known. We've covered that pretty closely in the brief. And the moving force or what the court and Justice O'Connor in that Bryan County versus Bryan case says is direct cause, that's no more than approximate cause. And we cited the case where Justice Scalia actually taught it. It's a Babbitt versus Sweet Home case where Justice O'Connor agrees that that's proximate cause as well. So proximate cause is nothing more than but-for cause. But-for, the fact that they didn't teach these officers that there's odd numbers on one side and even on the other didn't require that at night that they at least confirm the address where they were. They knew where they were. They were right at 412. And he says, but, you know, these go by four, so the next dot would be 409. And 409's across the street. And the fact that they allow them to invade the Kirtland, which Chief Krause admits that they did, and that's part of what they should teach them. That's what Hopner says that we've taught, not to notify the people when they go there. And there's no probable cause. There's no warrant. It's a clear violation. Collins v. Virginia sets out quite clearly that it's a presumption that they're in violation of the Fourth Amendment by entering the Kirtland without having any probable cause. They were at the wrong place. There was nothing, no probable cause that anything happened in the Waller household or in the Anita Jefferson household. And so basically then the only question is, is it foreseeable? And foreseeability, I think, is supplied largely by Dr. Taylor, Bob Taylor, who's a professor at UT Dallas, and of police science. He's a well-known author. He has a national reputation. And he says these policies are outside the purview of even any national policies with regard to they had no written policy with regard to how to handle these alarm calls. And Chief Krause agrees with this. Ninety percent of alarm calls were false alarms. And this was not even that because they said Mrs. Bailey, who lived over there, was ill and would somebody check on her. Now, because it was a burglar alarm, they sort of say it's an alarm call, but basically the alarm people had talked to a neighbor and they said she was sick and they wanted her checked on. It was really a welfare call. But they don't have written policies even on these alarm cases. And the other thing is, now the judge makes a couple other mistakes. There's a video that's reprinted here, and it's in evidence, made by Chief Hall, Jeff Halstead, who was the police chief at the time, in which he talks about the fact we have these young people on, these young rookies on at night, and all this stuff that happens. And he talks about an event in which they went after somebody. They fired 14 shots into the car. Fortunately, they didn't hit anybody, including themselves. And he was actually – time's up? Sorry. Thank you. Thank you. The Supreme Court in Anderson v. Liberty Law plainly says discredited testimony, allegations are not enough to overcome summary judgment. Plaintiffs spend a lot of time trying to find immaterial discrepancies, and somebody said six feet, somebody said seven feet, somebody said this, somebody said that. A lot of what he criticizes is Officer Hanlon's account. Ironically, Officer Heppner says he was at seven yards when the shot was fired. Plaintiffs' experts say he was at seven yards. There's no dispute about that he was at seven yards. Officer Hanlon might have had the wrong distance when he gave his statement. But the plaintiff's own expert, Ed Hiskey, says that he wrote a book that said that police officers, after high-stress shootings, are going to get facts wrong. The most common fact they get wrong, there's a phenomenon that they get the position at which hand the gun was in wrong. There's a mirroring transposition that goes on in the brain when the stress hits them, and it's extremely common for police officers to say the gun was in the wrong hand of the suspect or not being able to remember. And here, like I said, Officer Heppner never said it was in his left hand. He said it looked like he was in both, and the explanation is he comes forward and aims both arms forward. Dr. Krusecki said that the lateral wounds on the left arm are consistent with the arm facing forward toward the officer. I failed to mention that the last paragraph of the district court's opinion says expert opinion. The problem is he never looks at the expert's opinions. He expressly refuses to do so. When you read these expert's opinions, Mr. Hiskey's in particular, the evidence we're talking about here, big drops versus little drops versus smear versus transfer versus contact, blood patterns, these are not things that you can look at pictures of crime scene photographs and draw conclusions about without these experts. And if that's all there was, then we would have that problem, but the problem beyond that is the experts actually support the officer's account. They don't come out and say that what the officers say couldn't have happened because they weren't even tasked with that. He talks about Mr. Taylor, plaintiff's police expert, at 59-59 of the record, draws the conclusion that Officer Heppner absolutely thought he was facing a real burglar when Mr. Waller walked out carrying a gun. He responded to a burglary alarm call. That's the call that he received that he responded to. When he gets there, there's a car that is out of character for the neighborhood parked back in the dark of the driveway. The garage door at 2 o'clock in the morning was inexplicably open, and Mr. Waller came out carrying a gun. The statements about there's no way Mr. Waller would have rearmed himself because he had no reason to do that, I don't want to go into much of what was going on in Mr. Waller's life, but his wife was concerned because he kept a bag of cash in the trunk of his car and he was afraid somebody was going to come rob him, and that's why he kept the gun by the door. There's every reason to believe Mr. Waller thought these were actually burglars robbing him, whether or not they identified themselves as police or he heard them identify themselves as police or believed it or whatever. There's no explanation that will ever be able to definitively prove why he rearmed himself and pointed the gun at Hefner, but that's what the evidence unquestionably shows. The Mendez case supports this court's rulings, repeated rulings, that a Fourth Amendment claim is analyzed at the time the use of force decision is made and at no other. The Ninth Circuit had what they called the provocation rule, which tried to do something different. The Supreme Court in Mendez said, nope, all you do is you look at the Fourth Amendment claim at the time it accrues, nothing else. Now, if there were an earlier Fourth Amendment separate claim that the plaintiffs brought, which they had in the Mendez case, then that's a separate claim and those damages are pointed to that claim and the damages may or may not overlap. Plaintiffs at some point decided that that was their ticket to try to change the course of this litigation and say that, well, we've always had this other claim. Well, they haven't. If they had ever tried to assert it, read Judge Means' 2018 opinion, it dismissed everything in the case that he didn't expressly say survived. And I, too, am out of time. Thank you, Your Honors.